## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Maria Vomvolakis, Derivatively on Behalf of Nominal Defendant BIOXCEL THERAPEUTICS, INC., | Case No. |
| Plaintiff, | |
| v. | |
| VIMAL MEHTA, RICHARD I. STEINHART, PETER MUELLER, JUNE BRAY, SANDEEP LAUMAS, MICHAEL MILLER, MICHAL VOTRUBA, AND KRISHNAN NANDABALAN, | |
| Defendants, | |
| BIOXCEL THERAPEUTICS, INC., | |
| Nominal Defendant. | |

### VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

By and through her undersigned counsel, Plaintiff Maria Vomvolakis ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Bioxcel Therapeutics, Inc. ("BioXcel" or the "Company") and against Defendants Vimal Mehta, Richard I. Steinhart, Peter Mueller, June Bray, Sandeep Laumas, Michael Miller, Michal Votruba, and Krishnan Nandabalan (collectively, the "Individual Defendants") for violation of federal securities laws, breaches of the directors and officers fiduciary duties, unjust enrichment, and waste of corporate assets. Defendant Bioxcel, along with the Individual Defendants, are referred to herein collectively as the "Defendants."

Plaintiff alleges the following against the Defendants based upon personal knowledge as to herself and her acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the public documents, transcripts of conference calls and announcements made by

BioXcel, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by, and regarding, BioXcel, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings filed in the securities class action in the United States District Court District of Connecticut, *Tony A Hills and Oklahoma Law Enforcement Retirement System, Individually and on Behalf of All Others Similarly Situated v. Bioxcel Therapeutics, Inc.*, Case No. 3:23-cv-00915-SVN (D. Conn.) (the "Securities Action").  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by BioXcel directors and officers from December 15, 2021 through the present (the "Relevant Period") and to recover the excessive and unfair compensation they have awarded to themselves in breach of their fiduciary duties, and to set meaningful limits and controls on their ability to do so going forward.

2.     BioXcel Therapeutics, Inc. is a fledgling New Haven, Connecticut based biopharmaceutical company surviving solely on one commercial product derived from the BXCL501 molecule utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immuno-oncology.

3.     BioXcel's net revenue was $0 in 2021 and $375,000 for the full year 2022.

4.     Despite this lack of revenue in 2021, BioXcel's average total compensation per non-employee director, excluding Defendant Krishnan Nandabalan, was $612,952.75.  This is almost triple the compensation paid to non-employee directors of similarly sized companies in the biopharmaceutical industry.

5.     The Company's lead and only product derived from the BXCL501 molecule is sold and marketed under its brand name IGALMI, which achieved FDA-approval in July 2022 to treat schizophrenia and bipolar disorder patients.

6.     Piggybacking on its approval for a drug derived from the BXCL501 molecule, BioXcel sought to launch another new indication of BXCL501 to treat Alzheimer's disease-related agitation.

7.     Before it could bring this new indication of BXCL501 for Alzheimer's to market, BioXcel had to run a clinical trial, labeled the TRANQUILITY II, in strict compliance with FDA rules and regulations.  It failed to do so when the TRANQUILITY II clinical trial was prematurely green lit under the supervision of a principal investigator who cut corners while under mounting pressure to fast track BXCL501 to market under exigent circumstances to meet artificial milestones set by BioXcel's biggest lenders Oaktree Capital Management, L.P. ("Oaktree") and Qatar Investment Authority ("QIA").

8.     This overzealous clinical trial for the new indication of BXCL501 resulted in a FDA investigation and Form 483 Letter BioXcel received after the FDA discovered multiple violations of clinical trial rules during BioXcel's TRANQUILITY II trial for BXCL501.

9.     BioXcel first announced a program to evaluate BXCL501 for the treatment of acute agitation associated with Alzheimer's disease on December 15, 2021.  The announcement emphasized the more than 4 million Alzheimer's patients who experience acute agitation associated with Alzheimer's disease, alluding to the significant value add BXCL501 could have on the Company's stock price.  Analyst HC Wainwright joined in the hype, raising its 12-month target for the price of BioXcel's common stock - which was trading at the time at $22.30 per share - to $140 per share.

10.     BioXcel stated that the program consisted of two randomized, double-blind, placebo-controlled studies: TRANQUILITY II and TRANQUILITY III. The studies were purportedly designed to evaluate the safety and efficacy of BXCL501 in adults 65 years and older across the range of illness including mild, moderate, and severe dementia in assisted living or residential facilities and nursing homes.

11.     The principal investigator assigned to oversee the trials was Dr. Caitlin Meyer with Segal Trials, a lesser-known regional operation in South Florida.

12.     This unbridled enthusiasm for this new indication of BXCL501, TRANQUILITY II trial, and TRANQUILITY III trial did not last long.  On December 21, 2022, Dr. Meyer received a Form 483 notification from the FDA (the "Form 483 Letter") with several complaints regarding the TRANQUILITY II clinical trial including:

- 25 of 37 patients did not have sufficient documentation showing they met all inclusion criteria. Three of these patients' files demonstrated they potentially *met exclusion criteria of having memory impairment or cognitive impairment unrelated to Alzheimer's Disease.*

- The clinical trial was *not being conducted in accordance with the approved protocol* in certain instances.

- At least *one Serious Adverse Event occurred that was not timely reported* to the medical monitor or safety team.

- Certain study participants *did not sign a proper consent form* which meant they might have to be excluded from the study, resulting in insufficient participation.

13.     BioXcel kept this Form 483 Letter a secret from the public market and never reported it as an unscheduled material event or corporate change in a form 8-K, 10-Q or 10-K as required under SEC rules until months later on June 29, 2023.  Instead, BioXcel continued to perpetuate a ruse that the TRANQUILITY II clinical trial would be a valuable catalyst to the Company, claiming, among other things, that the trial would result in "*a watershed moment for*

*the company"* and *"significant market expansion opportunities program, BXCL501."*

14.    On June 29, 2023, before the market opened, BioXcel publicly disclosed the Form 483 Letter for the first time and that its principal investigator, Dr. Meyer, for the Phase 3 TRANQUILITY II clinical trial had failed to "adhere to the informed consent form approved by the Institutional Review Board" for some subjects and failed to maintain adequate case histories for certain patients whose records were reviewed by the FDA.

15.    Adding to this concern, BioXcel also disclosed that Dr. Meyer, "may have fabricated" email correspondence purporting to demonstrate that the investigator timely submitted to the company's pharmacovigilance safety vendor a report of a serious adverse event purporting to show that the vendor had confirmed receipt. BioXcel also disclosed that the fabricated email correspondence was provided to the FDA during an on-site inspection in December 2022.

16.    BioXcel further admitted that it was in the process of conducting an investigation into protocol adherence and data integrity at the principal investigator's trial site and that it was in the process of retaining an independent third party to audit the data collected at the site. Finally, BioXcel disclosed that the foregoing "may impact the timing of the Company's development plans for, and prospects for regulatory approval of, BXCL501 for the acute treatment of agitation associated with dementia in patients with probable Alzheimer's disease."

17.    BioXcel's stock sank 63.8% on this news, from $17.67 at the close of trading on June 28, 2023, to $11.28 per share at the close of trading on June 29, 2023.

18.    Analysts were dismayed. For example, an analyst report issued by Canaccord Genuity on June 29, 2023 noted that "any enthusiasm around the data was overwhelmed by the revelation in an 8-K filing that a principal investigator's (PI) actions at a site that enrolled 40%

of study participants had led to an unresolved FDA Form 483, and a more recent incident that BTAI reported to the FDA." On that same day, Guggenheim issued an analyst report that stated, "[t]he positive study news will be overshadowed by the disclosure that a single PI who enrolled 40% of the patients in the study triggered the FDA to issue a Form 483." The report went on to state that "Tranquility II data are clean, even if a bit underwhelming… but trial conduct and data integrity are a key focus."

19.     After BioXcel received the Form 483 Letter and before it became public knowledge, individual defendants Vimal Mehta, Richard Steinhart, and Krishnan Nandabalan used this material non-public information to engage in insider trading selling their BioXcel stock before the stock plummeted.

20.     Between receiving the Form 483 Letter and its public disclosure, BioXcel issued several press releases, presented at investment and banking conferences, held conference calls, and filed several reports with the SEC attesting to the accuracy of the Company's financial health and viability, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

21.     These communications and SEC filings failed to disclose BioXcel's exposure to the inept clinical trials, FDA investigation, and Form 483 Letter in breach of its disclosure obligations.

22.     Several confidential witnesses who worked at the Company and were interviewed in the Securities Class Action confirmed that: (1) the Company was in a rush to meet its lenders' benchmarks to secure more funding (2); Segal Trials, the clinical research operator, was unqualified but would push the trials faster; (3) BioXcel had constant and regular communication with the FDA; (4) financing from Oaktree was critical to company survival; (5) BioXcel CMO

Robert Risinger ("Risinger") was a micromanager over studies and he gave regular reports to the C-Suite; (6) CEO Mehta received regular reports from the head of translational medicine, pharmacology and regulatory affairs at BioXcel.

23.      As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed.

24.      Between BioXcel's wasted capital spent on the clinical trials, lost market cap, fines, penalties, ongoing testing and additional clinical trials, regulatory investigations, the Securities Action, the insider trading, reputational loss, and loss of goodwill, BioXcel is exposed to millions in damages and its directors are exposed to personal liability with every current director also a named defendant because they served on the board during the Relevant Period.

25.      As such, a majority of the Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence because there is a substantial likelihood that a majority of the Company's current directors are personally liable in this derivative action and the Securities Litigation for unexculpated breaches of fiduciary duty and securities laws violations.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question based on violations of the Exchange Act.

27.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

28.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

## PARTIES

29.     Plaintiff Maria Vomvolakis is a current shareholder of BioXcel and has been continuously since November 2021.

30.     BioXcel, a Delaware corporation, trades on the Nasdaq Exchange under the symbol "BTAI." The Company is headquartered at 555 Long Wharf Drive, New Haven, CT 06511.

31.     Vimal Mehta ("Mehta") is the co-founder of BioXcel. Since May 2017, he has been the Company's Chief Executive Officer ("CEO") and President and served as the Company's Corporate Secretary from May 2017 to February 2021. Additionally, Mehta has been a member of Board since April 2017. Mehta is also the cofounder of BioXcel Corporation (now BioXcel LLC) and following that Company's inception in 2005, served as its Chairman of the Board and CEO until March 2023. During the Relevant Period, BioXcel paid Mehta $13,931,372 in total compensation.  Additionally, Mehta sold 191,000 shares of his personally held Company

stock for proceeds of $3,824,179 during the Relevant Period, while in possession of material nonpublic information ("MNPI"). Mehta is also named as a defendant in the Securities Class Action.

32.     Richard Steinhart ("Steinhart") has been BioXcel's Senior Vice President and Chief Financial Officer ("CFO") since March 2018 and Vice President and CFO between October 2017 and March 2018. Additionally, Steinhart sold 7,084 shares of his personally held Company stock for proceeds of $176,502 during the Relevant Period, while in possession of MNPI. Steinhart is also named as a defendant in the Securities Class Action.

33.     Peter Mueller ("Mueller") has been Chairman of BioXcel's Board since August 2017 and a member of the Board since April 2017. Mueller is also Chair of the Compensation Committee, Chair of the Nominating and Corporate Governance Committee, and a member of the Audit Committee. During the Relevant Period, BioXcel paid Mueller $822,431 in total compensation.

34.     June Bray ("Bray") has been a member of BioXcel's Board since March 2021. Bray is also a member of the Nominating and Corporate Governance Committee. During the Relevant Period, BioXcel paid Bray $1,182,173 in total compensation.

35.     Sandeep Laumas ("Laumas") has been a member of BioXcel's Board since September 2017. Laumas is also Chair of the Audit Committee, a member of the Compensation Committee, and a member of the Nominating and Corporate Governance Committee. During the Relevant Period, BioXcel paid Laumas $765,727 in total compensation.

36.     Michael P. Miller ("Miller") has been a member of BioXcel's Board since June 2022. Miller is also a member of the Audit Committee. During the Relevant Period, BioXcel paid Miller $355,251 in total compensation.

37. Michal Votruba ("Votruba") has been a member of BioXcel's Board since March 2019. Votruba is also a member of the Audit Committee. During the Relevant Period, BioXcel paid Votruba $722,706 in total compensation.

38. Krishnan Nandabalan ("Nandabalan") is a cofounder of BioXcel and was a member of BioXcel's Board from May 2017 until September 19, 2023, when he resigned from the Board. Nandabalan also served as a consultant to the Company in the capacity of Chief Digital Officer from January 2020 to August 2022. Nandabalan is also a cofounder of BioXcel Corporation (now BioXcel LLC) and following that Company's inception in 2005, has served as its President, Secretary, and Chief Scientific Officer and as a member of its Board. Finally, Nandabalan has also served as CEO and a director of InveniAI LLC, a wholly owned subsidiary of BioXcel, LLC, since May 2017. During the Relevant Period, BioXcel paid Nandabalan $250,000 in total compensation.

39. Additionally, Nandabalan sold 180,000 shares of his personally held Company stock for proceeds of $3,260,076 during the Relevant Period, while in possession of MNPI.

40. Collectively, Mehta, Steinhart, and Nandabalan are referred to herein as the "Insider Trading Defendants."

41. Collectively, Mehta, Mueller, Bray, Laumas, Miller, Votruba, and Nandabalan are referred to herein as the "Director Defendants."

42. Collectively, Mehta, Steinhart, Mueller, Bray, Laumas, Miller, Votruba, and Nandabalan are referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

43. By reason of their positions as officers, directors, and/or fiduciaries of BioXcel and because of their ability to control the business and corporate affairs of BioXcel, the Individual

Defendants owed BioXcel and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BioXcel in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of BioXcel and its shareholders so as to benefit all shareholders equally.

44. Each director and officer of the Company owes to BioXcel and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

45. The Individual Defendants, because of their positions of control and authority as directors and/or officers of BioXcel, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

46. To discharge their duties, the officers and directors of BioXcel were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company. 89. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BioXcel, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants

who collectively comprised a majority of BioXcel's Board at all relevant times.

47.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASQAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

48.     To discharge their duties, the officers and directors of BioXcel were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of BioXcel were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to BioXcel 's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how BioXcel conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of BioXcel and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;'

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that BioXcel's operations would comply with all applicable laws and BioXcel's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

49.      Each of the Individual Defendants further owed to BioXcel and the shareholders the duty of loyalty requiring that each favor BioXcel's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

52.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of BioXcel was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of BioXcel and was at all times acting within the course and scope of such agency.

## INSIDER TRADING POLICY

55.     BioXcel has written an Insider Trading Policy effective March 7, 2018 "to take an active role in the prevention of insider trading violations by its officers, directors, employees and other related individuals."

56.     The Insider Trading Policy incongruously appoints Mehta, as the Chief Executive Officer of the Company (or his or her successor in office), or such other person reporting to the Chief Executive Officer as the Chief Executive Officer shall designate and oversee, as the Company's Insider Trading Compliance Officer

57.     The Insider Trading Policy states, among other things, in pertinent part:

**Exhibit A BioXcel Therapeutics, Inc.**

## INSIDER TRADING POLICY

This Insider Trading Policy (the "Policy") provides guidelines to officers, directors, employees (including temporary employees) and other related individuals of BioXcel Therapeutics, Inc (the "Company") with respect to transactions in the Company's securities.

### The Reasons for an Insider Trading Policy

The Federal securities laws prohibit the purchase or sale of securities by persons who are aware of Material Nonpublic Information (as defined below) about a company, as well as the disclosure of Material Nonpublic Information about a company to others who then trade in the company's securities. These transactions are commonly known as "insider trading."

Insider trading violations are pursued vigorously by the Securities and Exchange Commission (the "SEC"), and the U.S. Attorneys and are punished severely. While the regulatory authorities concentrate their efforts on individuals who trade, or who tip inside information to others who trade, the Federal securities laws also impose potential liability on companies and other "controlling persons" if they fail to take reasonable steps to prevent insider trading by company personnel.

The Company's Board of Directors (the "Board") has adopted this Policy both to satisfy the Company's obligation to prevent insider trading and to help Company personnel avoid the severe consequences associated with violations of the insider trading laws. For purposes of this policy, the term "Company" includes BioXcel Therapeutics, Inc. and its subsidiaries.

This Policy also is intended to prevent even the appearance of improper conduct on the part of anyone employed by or associated with the Company.

### Applicability of Policy

This Policy applies to all transactions in the Company's securities, including common stock, options for common stock and any other securities the Company may issue from time to time, such as preferred stock, warrants and convertible debentures, as well as to derivative securities relating to the Company's stock, whether or not issued by the Company, such as exchange-traded options. This Policy applies to the following persons:

1. All officers of the Company;
2. All members of the Board;
3. All employees (including temporary employees) of, and consultants and contractors to, the Company who receive or have access to Material Nonpublic Information regarding the Company;
4. Family members and other individuals who reside with any of the persons listed in 1-3 above; and family members and other individuals who do not reside with any of the persons listed in 1-3 above but whose transactions in Company securities are directed by such persons or are subject to such persons' influence or control

The persons listed above are sometimes referred to in this Policy as "Insiders". This Policy also applies to any person who receives Material Nonpublic Information from any Insider. Persons listed in 1-3 above are responsible for the transactions of persons listed in 4-5 above and should make them aware of the need to confer with you before they trade in Company securities. As used in this Policy, "you" means anyone subject to this Policy.

Any person who possesses Material Nonpublic Information regarding the Company is

an Insider subject to this Policy for so long as the information is not publicly known (even if that person ceases being a director, officer, employee, consultant or contractor while in the possession of Material Nonpublic Information). Any employee can be an Insider from time to time, and would at those times be subject to this Policy.

## General Statement of Policy

It is the policy of the Company to oppose the unauthorized disclosure of any nonpublic information acquired in the work-place and the misuse of Material Nonpublic Information in securities trading.

## Specific Policies

1.      **Trading on Material Nonpublic Information**. No Insider shall engage in any transaction involving a purchase or sale of the Company's securities (including any offer to purchase or offer to sell), other than pursuant to a pre-approved trading plan that complies with Rule 10b5-1 promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), during any period commencing with the date that he or she possesses Material Nonpublic Information concerning the Company, and ending at the close of trading on the second Trading Day following the date of public disclosure of that information, or at such time as such nonpublic information is no longer material. As used in this Policy, the term "Trading Day" shall mean a day on which national stock exchanges in the United States are open for trading.

## Potential Criminal and Civil Liability and/or Disciplinary Action

1.      **Liability for Insider Trading**. Insiders who engage in transactions in the Company's securities at a time when they have knowledge of nonpublic information regarding the Company may be subject to the following penalties:

- A civil penalty of up to three times the profit gained or loss avoided;
- A criminal fine of up to $5,000,000; and
- A jail term of up to twenty years.

## Trading Restrictions

2.      **Pre-clearance of Trades**. No person listed on Exhibit B or C may purchase, sell, or otherwise engage in any transaction in securities of the Company (including an equity incentive plan transaction such as a stock option exercise) without obtaining prior clearance of the transaction by the Insider Trading Compliance Officer. A request for pre-clearance should be submitted at least two days in advance of the proposed transaction. The Insider Trading Compliance Officer will then determine whether the transaction may proceed and, if the approved transaction involves a director or officer, will also direct the appropriate personnel at the Company to assist such director or executive officer in complying with the reporting requirements under Section 16 of the Exchange Act. Pre-

cleared transactions not completed within five (5) business days require a new pre-clearance under the provisions of this paragraph. The Insider Trading Compliance Officer may, in his or her discretion, shorten such time period. The Insider Trading Compliance Officer is under no obligation to approve a trade submitted for pre-clearance and may determine not to permit the trade. The Insider Trading Compliance Officer will have no liability for any refusal to permit a trade or for any delay in making or communicating a decision.

The Insider Trading Compliance Officer may, from time to time, require compliance with the preclearance process by certain employees, consultants and contractors other than and in addition to those persons listed on Exhibit B and C.

An Insider requesting pre-clearance of a transaction in the Company's securities during an event specific blackout will be informed of the existence of a blackout period, but may not be advised of the reason for the blackout (other than Insiders who are directors of the Company, who shall have the right to know the reason for the blackout). If you are made aware of the existence of an event-specific blackout, you should not disclose the existence of the blackout to any other person. Whether or not you are designated as being subject to an event-specific blackout, you still have the obligation not to trade while aware of Material Nonpublic Information.

**3.    Rule 10b5-1 Trading Plans**. The SEC has adopted a rule that permits insiders to trade in certain circumstances where it is clear that inside information was not a factor in the decision to trade. Rule 10b5-1 provides that an individual who buys or sells securities while aware of Material Nonpublic Information does not violate Rule 10b-5 if the buying or selling is in conformity with a binding contract, instruction or written plan (a "Trading Plan") that was put into place at a time when the individual was not aware of Material Nonpublic Information. Establishing such a pre-arranged trading plan provides an opportunity for an Insider to limit his or her potential insider trading liability. When trading arrangements are prearranged, it becomes clearer to the investing public (and potential plaintiffs) that the Insider's purchases and sales are not being prompted by his or her knowledge of current developments within the Company, or such person's feelings about the Company's prospects.

The Company permits its directors and officers to set up Trading Plans. However, great care must be exercised in relying on Rule 10b5-1, for the following reasons:

- In order to meet the requirements of Rule 10b5-1, binding contracts, instructions and written plans must: (i) lock in the amount, price and dates of future trades; (ii) provide a formula or algorithm for determining future trades; or (iii) delegate discretion for determining amount, price and dates to a third party precisely as provided under the rule.

- The ability to modify provisions once locked in is limited, and modification or termination of arrangements can be risky.

- Although Rule 10b5-1 may help directors and officers avoid liability under Rule 10b-5, it does not eliminate other relevant securities law requirements and prohibitions. Therefore, buying and selling in reliance on Rule 10b5-1 must also be designed to comply with the reporting and short-swing profit rules under Section 16 of the Exchange Act, the limitations on insider selling imposed by Rule 144 under the Securities Act of 1933, as amended (the "Securities Act"), the prohibition on trading during administrative blackouts under 401(k) or other retirement plans, and, in some cases, certain other securities law requirements.

- The liability avoidance provisions of Rule 10b5-1 are affirmative defenses. If the government can prove that an individual was aware of Material Nonpublic Information at the time of a purchase or sale, the burden of proving that trading was pursuant to an adequate contract, instruction or written plan will be on the individual. Compliance must be well documented and capable of proof in court.

     **5.** **<u>Quantitative Limits for Sales by Directors and Officers</u>**. The Insider Trading Compliance Officer shall not pre-clear any Trading Plan that provides for the sale in any calendar month (including by virtue of a carryover from a prior month) of an amount of securities that represents more than 1/12th of 25% of the vested interest in the Company's common stock held by the person that is adopting the Trading Plan as of the effective date of such Trading Plan. The Insider Trading Compliance Officer shall also use this quantitative guideline when considering pre-clearance of trades in the Company's securities outside of Trading Plans. This quantitative guideline shall not apply to "sell-to-cover" transactions in which shares of the Company's common stock underlying vested stock options are sold by a person solely for the purpose of generating proceeds to pay the exercise price for, and taxes associated with, the exercise of such vested stock options, and such vested stock options expire within one year of: (i) the effective date of the Trading Plan; or (ii) the date of a trade outside of a Trading Plan. This Section 5 shall only apply to Trading Plans to be adopted by, or trades in the Company's securities outside of Trading Plans by, persons subject to Section 16 of the Exchange Act. The Audit Committee of the Board shall have the authority to interpret and, if it deems necessary, advisable or appropriate, to approve exceptions to, or grant waivers of, this Section 5.

     **8.** **<u>Individual Responsibility</u>**. Every Insider has the individual responsibility to comply with this Policy. An Insider may, from time to time, have to forego a proposed transaction in the Company's securities even if he or she planned to make the transaction before learning of the Material Nonpublic Information and even though the Insider believes he or she may suffer an economic loss or forego anticipated profit by waiting. Transactions that may be necessary or justifiable for independent reasons (such as the need to raise money for an emergency expenditure) are not exempted from this Policy. The securities laws do not recognize such mitigating circumstances. In any event, even the appearance of an improper transaction must be avoided to preserve the Company's reputation for adhering to the highest standards of conduct.

## AUDIT COMMITTEE CHARTER

58.     BioXcel's Audit Committee, of which Laumas is Chair and Mueller, Miller, and Votruba are members, has a responsibility to, among other things, assist the Board's oversight of the Company's accounting and financial reporting processes. The Company's Audit Committee Charter states in part:

*Audited Financial Statements*

> 7.     <u>Review and Discussion of Financial Statements</u>. The Committee shall review and discuss with the Company's management and independent auditor the Company's financial statements prior to their public disclosure ...
>
> 8.     <u>Recommendation to Board Regarding Audited Financial Statements</u>. The Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K to be filed with the SEC.
>
> 9.     <u>Audit Committee Report</u>. The Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement for the Company relating to its annual meeting of stockholders.
>
> * * *
>
> 11.    <u>Review and Discussion of Earnings Releases</u>. The Committee is expected to review and discuss the Company's earnings press releases, including whether the Company will issue a preliminary earnings release and, if approved, determine the financial or business information to be included in such preliminary earnings

*Controls and Procedures*

> 12.    <u>Oversight</u>. The Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct.
>
> 13.    <u>Risk Management</u>. The Committee shall discuss the Company's policies with respect to risk assessment and risk management including guidelines and

*Controls and Procedures*

> 12.    <u>Oversight</u>. The Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct.

13.    <u>Risk Management</u>. The Committee shall discuss the Company's policies with respect to risk assessment and risk management including guidelines and

59.    BioXcel's Nominating and Corporate Governance Committee, of which Mueller is Chair and Bray and Laumas are members, has a responsibility to, among other things, develop and recommend to the Board corporate governance guidelines. The Company's Nominating and Corporate Governance Committee Charter states in part:

3. <u>Corporate Governance</u>

(a)    <u>Corporate Governance Guidelines</u>. The Committee shall develop and recommend to the Board corporate governance guidelines applicable to the Company. The Committee shall, from time to time as it deems appropriate, review and reassess the adequacy of such corporate governance guidelines and recommend any proposed changes to the Board for approval.

(b)    <u>Board Leadership Structure</u>. The Committee shall periodically review the Board's leadership structure to assess whether it is appropriate given the specific characteristics and circumstances of the Company.

## CODE OF BUSINESS CONDUCT AND ETHICS

60.    BioXcel also has written Corporate Governance Guidelines to "assist the Board in the exercise of its responsibilities and to serve the interests of the Company and its stockholders." The Corporate Governance Guidelines state in pertinent part:

K.    <u>Director Responsibilities</u>

The Business and affairs of the Company will be managed by or under the direction of the Board, including through one or more of its committees as set forth in the Company's bylaws and committee charters. Each director is expected to spend the time and effort necessary to properly discharge his or her responsibilities. These include:

- exercising their business judgement in good faith;

- acting in what they reasonably believe to be the best interest of its stockholders;

- becoming and remaining well-informed about the Company's; business and operations and general business and economic trends affecting the Company; and

- ensuring that the business of the Company is conducted so as to further the long-term interests of its stockholders

* * *

## V.   Risk Management

As provided in the Audit Committee Charter, the Audit Committee is responsible for reviewing and discussing, and periodically reporting to the Board with respect to, the Company's policies, programs and practices with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled. In accordance with those policies, programs and practices, the Board and the Board committees shall have an active role in overseeing management of the Company's risks. The Board shall regularly review information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. In addition, the Board shall receive regular briefings from senior management, no less than annually, on information security matters, including data privacy and cybersecurity…While each committee shall be responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks.

61.    Finally, BioXcel has a written Code of Business Conduct and Ethics, applicable

to all directors, officers, and other employees, which states in part:

## VII.   Company Records

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include, but are not limited to, financial records . . . records relating to our technology and product development, clinical development . . . manufacturing and regulatory submissions and all other records maintained in the ordinary course of business.

All Company records must be complete, accurate and reliable in all material respects…

* * *

## IX.   Accuracy of Financial Reports and Other Public Communications

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition, and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the Company's finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

### X.       Compliance with Laws and Regulations

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation ... insider trading…false or misleading financial information…You are expected to understand and comply with all laws, rules and regulations that apply to your job position…

A.     The Food, Drug and Cosmetic Act and Interactions with the Food and Drug Administration

The Company's products, product candidates and operations are subject to extensive and rigorous regulation by the [FDA] under the Federal Food, Drug, and Cosmetic Act (the **"FFDCA"**) and its implementing regulations. The FDA regulates many areas of the company's operations, including, but not limited to, the development, design, non-clinical and clinical research, manufacturing, safety, efficacy, labeling, packaging, storage, recordkeeping, premarket clearance or approval, adverse event reporting, advertising, promotion, marketing, sale and distribution of our products .... Violation of these laws and regulations can have significant impacts on the Company and its products, including, among other things, severe civil and criminal penalties, adverse publicity for the Company, total or partial suspension of production of a Company product, withdrawal of a Company product from the market or restrictions on our ability to continue selling a Company product….

Company employees with responsibilities in the areas governed by the FFDCA and FDA regulations are required to review, understand and comply with applicable laws and regulations. These employees are expected to have a thorough understanding of the laws, regulations and other relevant standards applicable to their job positions, and to comply with those requirements….

B.      Interactions with the Government

The Company may conduct business with the U.S. government, state and local governments and the governments of other countries. The Company is committed to conducting its business with all governments and their representatives with the highest standards of business ethics and in compliance with all applicable laws and regulations, including the special requirements that apply to communications with governmental bodies that may have regulatory authority over our products and operations, such as government contracts and government transactions.

If your job responsibilities include interacting with the government, you are expected to understand and comply with the special laws, rules and regulations that apply to your job position as well as with any applicable standard operating procedures that the Company has implemented…

* * *

**XI.     Public Communications and Regulation FD**

A.      Public Communications Generally

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosures of market-sensitive financial data. The Company has adopted a separate Policy Statement - Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of the market-sensitive financial data.

B.      Compliance with Regulation FD

In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or the Company's stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

62.     In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report known violations of the Code of Conduct and law.

63.    Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the  Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

**Confidential Witnesses**

64.    As mentioned above, the Securities Class Action interviewed seven current and former employees at BioXcel who had intimate knowledge of the affairs of the Company and whose knowledge demonstrates that the Defendants violate the code of conduct and were

materially misrepresenting the state of the Company and the drug trials to the investing public.

65.     C1 worked at BioXcel from November 2020 to October 2023. From November 2020 to October 2022, CWl was an Executive Director and Head of Medical Science Liaisons at BioXcel Therapeutics.  CWl then became a Medical Strategy/Medical Director at BioXcel and served in this position from August 2022 to October 2023.

66.     CW2 served as a Senior Director of the MSL team at BioXcel from January 2021 to September 2022.  CW2 described their function as an MSL as, "pre-approval, we talk to thought leaders or people who are experts in the area of the drug we're getting ready to launch."  CW 2 retired from BioXcel in September 2022 but was familiar with the TRANQUILITY studies.

67.     CW3 was a Senior Director at BioXcel for two years from 2020 through 2022. CW 3 oversaw the drug supply and reported to David Hanley, former senior vice president of global pharmaceutical development  and operations, who in tum reported to Defendant Mehta.

68.     CW4 was a former Associate Director of Financial Planning & Analysis ("FP&A") and Head of FP&A at BioXcel from January 2022 through February 2023. CW4 reported "directly to the CFO, with a dotted line to Vice President of Finance, Scott Szilagvi."  His day-to-day activities included "regular FP&A reporting, system implements, getting reports composed to budget."

69.     CW5 was an Executive Director at BioXcel from July of 2020 to April of 2022. CW5 oversaw research programming and worked one level below the Vice President.

70.     CW6 was an Institutional Sales Specialist at BioXcel from November of 2022 to June of 2023.

71.     CW7 was the Head of CMC Regulatory Affairs from July of 2020 to March of 2022. CMC stands for "chemistry, manufacturing and control."  CW7's job entailed making sure

that BioXcel manufactures a drug supply "on a timely basis, and that how" it is manufacturing the drug supply adheres to the NDA (New Drug Application.

72.     In pertinent part, the confidential witnesses admitted and/or testified that one of BioXcel's two primary investors "had, for the end of 2023, significant milestones that needed to be met, both for commercial sales and clinical studies." And "if not completed, either new funding wouldn't be available or, potentially, the company would have to kick back some money;" (2) Segal Trials was not a "legit" clinical research operator, but The C-suite level executives "thought it was going to be faster, doing it at Segal" (3); BioXcel would have been in regular communication with the FDA, even before the study began; (4) in hiring this principal investigator for the "good deal," "it felt like they were cutting corners. They didn't check much on the reputation of the investigator, and so on;" (4) "We were constantly analyzing how much we would get from Oaktree. We wanted to see how long we would last, if we didn't get funded;" Risinger, "was kind of monolithic" and that "he just ran everything;" (5) Risinger made "all the development decisions ... on a microscopic level" and attended meetings with other C-suite level executives "every day."

## **BACKGROUND AND MATERIAL ALLEGATIONS**

### *History, Operations and Capitalization of BioXcel*

73.     BioXcel is a Delaware corporation based in New Haven, CT and founded in 2017 as a clinical-stage biopharmaceutical company to develop medicines for immuno-oncology and neuroscience disorders such as Alzheimer's and cancer by using artificial intelligence developed by its parent firm.

74.     BioXcel went public via an initial public offering in March 2018 raising approximately $60 million in gross proceeds from the offering, before underwriting discounts

and commissions and other offering-related expenses, and since that time, its shares have traded on the NASDAQ.   As a publicly traded company, BioXcel is subject to SEC reporting requirements and is required to prepare its financial statements in accordance with U.S. generally accepted accounting principles.

75.    According to the Company's 10-K for the fiscal year ended December 31, 2022, BioXcel "leverages existing approved drugs and/or clinically evaluated product candidates together with big data and proprietary machine learning algorithms to identify new therapeutic indications."

76.    Two of the Company's most advanced clinical development programs are BXCL501, which is designed for acute treatment of agitation resulting from neurological and psychiatric disorders, and BXCL701, an immuno-oncology agent designed for treatment of a rare form of prostate cancer and for treatment of pancreatic cancer.  The company's lead asset is BXCL501.

77.     BXCL501 is an investigational, proprietary, orally dissolving, sublingual thin film formulation of dexmedetomidine, administered under the supervision of a health care provider, that is placed under the tongue or behind the lower lip.

78.    The FDA approved BioXcel's first indication of BXCL501, branded as "IGALMI," for the treatment of agitation in schizophrenia and bipolar patients in April 2022.

79.    Since going public, BioXcel revenue is comprised solely from IGALMI sales, its only product, but those sales have struggled to grow while the Company's debt and spending continues to mount, creating an untenable position for sustainability long term without the need for emergency fundraising.

80.    Cash strapped and debt ridden, BioXcel turned to financing from private financial

backers Oaktree and QIA to sustain operations. These lenders loaned BioXcel hundreds of millions of dollars to carry out its clinical trials. The loan payments to BioXcel came with strict conditions. First, BioXcel had to receive regulatory approval pathway for BXCL501. Second, BioXcel had to beat revenue thresholds. Thus, BioXcel's survival hinged largely on the TRANQUILITY clinical trials.

81. Sales reporting metrics also highlight the Company's vulnerability to potential bankruptcy as the Company recognized only $375,000 in revenues in FY 2022, $206,000 in revenues in the first quarter of 2023, and $457,000 in revenues in the second quarter of 2023.

82. On November 14, 2023, BioXcel released its 8-K filing, announcing financial results for the third quarter ended September 30, 2023. The company reported net revenue of approximately $341,000 derived solely from IGALMI for the quarter. Research and Development (R&D) expenses decreased to $19.6 million compared to $22.1 million in the same period in 2022, primarily due to reduced expenses in BXCL501 clinical trials. Selling, General and Administrative (SG&A) expenses increased to $24.3 million, up from $17.1 million in the previous year, attributed to one-time legal and professional fees, costs associated with the OnkosXcel potential public offering, and personnel costs related to the commercialization of IGALMI in the U.S. The net loss for the quarter was $50.5 million, an increase from a net loss of $41.8 million in the same quarter of 2022.

*FDA Investigation and Form 483 Letter*

83. Starting December 5, 2022 through December 21, 2022, the FDA conducted an inspection of the TRANQUILITY trial site to review its compliance with promulgated clinical testing criteria on several levels.

84. The inspection result culminated in the issuance of a Form 483 Letter to BioXcel.

The FDA issues a Form 483 Letter when an investigator from the FDA observes any conditions that constitute a violation of the FD&C and related Acts.  The Form 483 Letter noted several violations that had occurred within the TRANQUILITY II clinical trial at the North Miami trial site.

19.    These violations included (1) "25 out of 37 subjects reviewed and were randomized into the study and received investigational product did not have sufficient documentation to show they met all inclusion/exclusion criteria;" (2) "[f]our out of 37 subjects reviewed were initially consented using a Spanish short form that was not approved by the IRB.  Furthermore, the short form used did not contain information describing the basic elements of informed consent to include risks and study procedures;" (3) "Three of these subjects' files contained documentation they potentially met exclusion criteria of having memory impairment or worsening of cognitive function unrelated to probable Alzheimer's Disease;" (4) four of the subjects, "were initially dosed with investigational product using a urinary drug screen (UDS) ...  prior to dosing contrary to the protocol established schedule of events used to demonstrate subjects did not meet exclusion criteria;" and (5) Meyer was not reporting Serious Adverse Events ("SAE") within the 24-hour time period required by the protocol.

85.    Once a Form 483 letter is issued, the sponsor of the study is required to participate in any corrective actions alongside the principal investigator,

86.    As such, BioXcel would have been immediately notified of the 483 Letter and be required to act accordingly.

### FALSE AND MISLEADING STATEMENTS

87.    Defendants made a conscious decision to withhold the 483 Letter, a materially

adverse event, from the public for six months in violation of their reporting obligations.

88.     Not only did Defendants sweep the 483 Letter under the rug for many months, they added insult to injury by undertaking a brazen campaign touting optimism about the TRANQUILITY II trial at presentations, in press release, and SEC filings designed to dupe investors into believing the TRANQUILITY II trial was running smoothly.

1.   **On December 7, 2022 Bank of America Presentation**

89.     On December 7, 2022, Defendants spoke at the Bank of America 2022 Virtual Biotech SMID Cap Conference.  Defendant Mehta told investors, in pertinent part, that *"TRANQUILITY 2 is in advanced stages of enrollment, and it's progressing well* and we expect that data readout again in first half of 2023. So we have 2 pivotal data readouts in first half of 2023."

90.     These positive statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) the *TRANQUILITY 2* was not "progressing well;" (2) on December 5, 2022, the FDA initiated a BIMO investigation into the North Miami clinical trial site, which comprised 40% of the TRANQUILITY II study and was being overseen by Dr. Meyer who was an inexperienced principal investigator employed by a disreputable clinical trial company; (3) by the date of the above statement, Dr. Meyer had already violated study protocols by, *inter alia,* failing to exclude ineligible trial participants and failing to adhere to the study's informed consent requirements; and (4) although the study was in "advanced stages of enrollment," BioXcel faced an acute risk of adverse regulatory action that would invalidate the TRANQUILITY II data, materially delay progression of the Company's clinical trial plan, and

necessitate additional capital to remediate the protocol failures and/or complete the trial.

**2.   January 11, 2023 J.P. Morgan Healthcare Conference**

91.     On January 2023, Defendants presented at the J.P. Morgan Healthcare Conference with a PowerPoint that stated the ***"Phase 3 TRANQUILITY II Pivotal Trial"*** was ***"on Track in JH 2023."*** Within that same presentation, Defendants also represented that the "TRANQUILITY II Trial" had ***"Progressed"*** on a ***"Strong Foundation."***

92.     At the Healthcare Conference, Meha stated in, pertinent part, "[i]n addition, almost 100 million episodes in Alzheimer's-related agitation. There is no current approved therapy. Anything that is used to manage agitation has a black box warning. Like antipsychotics, benzodiazepine, we have a completely novel mechanism. It, we believe, target the causal mechanism of agitation. ***So we*** *are very excited about TRANQUILITY II data.* That is expected again in first half of 2023. So we have 2 pivotal data readouts in first half of 2023."

93.     These positive statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) Defendants had received the Form 483 Letter; (2) the TRANQUILITY II study was neither "on Track in lH 2023" nor on a "Strong Foundation;" (3) the readouts could not have been favorably pivotal; (4) and no reasonable person would be "excited" about the data under those negative circumstances.

**3.   February 21, 2023 BXCL501 Key Opinion Leader Day Event**

94.     On February 21, 2023, Mehta spoke at the Key Opinion Leader Day Event and stated, in pertinent part, "***[t]here are multiple opportunities to expand the market potential for this product,*** and we have upcoming 3 data readouts. ***One is Alzheimer's-related agitation, TRANQUILITY 11;*** SERENITY III, which is for at-home use. And third is our MDD. So all

3 *data readouts are on track, and we are excited to announce that in first half of 2023."*

95.     These positive statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) Defendants had received the Form 483 Letter; (2) the study was not "on track" in the context of "expand[ing] the market potential;" (3) and BioXcel now faced material risks that the trial data would be considered invalid or inaccurate, that the Company would incur additional costs to validate the topline results.

**4.   March 9, 2023 Press Release**

96.     On March 9, 2023 BioXcel issued a press release entitled "BioXcel Therapeutics Reports Fourth Quarter and Full Year 2022 Financial Results and Recent Operational Highlights." The press release stated, in relevant part:

> [BioXcel], a biopharmaceutical company utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immune-oncology, today announced its financial results for the fourth quarter and full year ended Dec. 31, 2022 and provided an update on key strategic initiatives.
>
> "Last year was a transformational period for the Company, highlighted by the launch of our first AI-discovered commercial product, IGALMI, in under four years since initiating human trials. A new treatment option is now available for patients suffering from agitation associated with schizophrenia or bipolar I or II disorder," said [Mehta], CEO of [BioXcel]. "We are building on these achievements in 2023 and look to accelerate our growth through commercial execution of IGALMI. We are also on track for significant data readouts for our overall neuropsychiatric program that has potential to address an estimated 139 million agitation episodes in the U.S. We have two pivotal study readouts for BXCL501 expected in the second quarter of 2023. Lastly, we plan to advance our lead immune-oncology program, BXCL701, into a Phase 2b registrational trial, pending further discussion with the FDA, in conjunction with exploring strategic options for our OnkosXcel subsidiary. These upcoming milestones, along with our strong financial foundation and late-stage programs, position [BioXcel] to deliver significant value to our shareholders while helping treat millions of patients."
>
> *      *      *
>
> Development Pipeline

BXCL501, a proprietary, sublingual film formulation of dexmedetomidine, has received [b]reakthrough [t]herapy and [f]ast [t]rack designation for the acute treatment of agitation associated with dementia.

- Alzheimer's Disease-related Agitation: TRANQUILITY program is designed to evaluate BXCL501 for the acute treatment of Alzheimer's- related agitation, where up to 100 million agitation episodes are estimated to occur in the U.S. annually.

    o TRANQUILITY II: Trial is fully enrolled; nearing completion of three-month observation period in a few patients in assisted living facilities (ALFs) and residential settings.

        ▪ Data cleaning and verification in progress.

        ▪ Top-line data from pivotal trial expected in Q2 2023.

    o TRANQUILUITY III: Continuing enrollment of patients with moderate to severe dementia in nursing homes.

97.    These positive statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (i) that the Company lacked processes to properly and effectively monito the TRANQUILITY II trial; (ii) the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; (iii) that the Company had in fact experienced such breaches when a BioXcel principal investigator failed to adhere to informed consent forms approved by the institutional review board, failed to maintain proper case histories for patients whose records were ultimately reviewed by the FDA, and fabricated email correspondence with a pharmacovigilance safety vendor that was subsequently reviewed by the FDA; and (iv) that these breaches would have a negative a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

5.   **March 9, 2023 Earnings Call**

98.     On March 9, 2023, BioXCeld held an earnings conference call to discuss BioXcel's operational and financial results for the fourth quarter of 2022. During the earnings call, Defendant Mehta stated, in pertinent part that **"*we believe the upcoming quarter may represent a watershed moment for the company.  In the second quarter, we expect to announce pivotal clinical data that potentially supports for our lead neuropsychiatric significant market expansion opportunities program, BXCLS0J,*"** and **"The TRANQUILITY *II* trial is fully enrolled and then - and the data cleaning and verification process has begun."**

99.     Durin the March 9, 2023, earnings call, Defendant Steinhart stated in pertinent part "***The company believes that full execution of our strategic financing with Oaktree and the Qatar Investment Authority would result in a cash runway into 2025."***

100.     These positive statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) Defendants had received the Form 483 Letter; (2) the upcoming quarter could not be considered ***a watershed moment for the company***, especially given the Form 483 Letter  and any fallout from its disclosure; (3)  positive pivotal data, if any, would be offset by the Form 483 Letter; (4) there could no market expansion when the Form 483 letter rendered the trials worthless; (5) the trial was not properly fully enrolled as evidenced by the Form 483 Letter.

## 6.  <u>March 16, 2023 10-K</u>

101.     On March 16, 2023, BioXcel filed its Form 10-K for the period ended on December 31, 2022. Mehta and Steinhart signed the Form 10-K on behalf of BioXcel.  The Form 10-K disclosed that BioXcel relied on third parties to conduct its trials while at the same time concealing that its primary investigator for 40% of the TRANQUILITY II patients had violated study protocols and that BioXcel had received the Form 483 as a result.  Specifically, the 10-K stated:

***We rely on third parties to conduct our preclinical and clinical trials. If these third parties do not successfully perform their contractual legal and regulatory duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.***

We have relied upon and plan to continue to rely upon third-party medical institutions, clinical investigators, contract laboratories and other third-party CROs to monitor and manage data for our ongoing preclinical and clinical programs. We rely on these parties for execution of our preclinical and clinical trials, and control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our studies is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards, and our reliance on the CROs does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with GCPs, which are regulations and guidelines enforced by the FDA, the Competent Authorities of the member states of the EEA and comparable foreign regulatory authorities for all of our products in clinical development.

Regulatory authorities enforce these GCPs through periodic inspections of trial sponsors, principal investigators and trial sites. ***If we or any of our CROs fail to comply with applicable GCPs, the clinical data generated in our clinical trials may be deemed unreliable and the FDA, the EMA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications.*** We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with product produced under cGMP regulations. ***Our failure to comply with these regulations may require us to repeat clinical trials, which would delay the regulatory approval process.***

If any of our relationships with these third-party CROs terminate, we may not be able to enter into arrangements with alternative CROs or to do so on commercially reasonable terms. In addition, our CROs are not our employees, and except for remedies available to us under our agreements with such CROs, we cannot control whether or not they devote sufficient time and resources to our on-going clinical, nonclinical and preclinical programs. If CROs do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced *or if **the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols, regulatory requirements or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our product candidates.*** As a result, our results of operations and the commercial prospects for our product candidates would be harmed, our costs could increase and our ability to generate revenues could be delayed.

102.    These statement disclaimers and premonitions were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) Defendants already knew that there were problems in the North Miami TRANQUILITY II trial site; (2) its key principal investigator had already failed to comply with regulations, thus calling into question the "quality [and] accuracy of the clinical data" obtained there; and (3) the Company had requested a meeting with the FDA to discuss the "entire TRANQUILITY program," including the TRANQUILITY II clinical trial and the data audit.

**7.  <u>May 8, 2023 Press Release</u>**

103.    On May 8, 2023, BioXcel issued a press release entitled "BioXcel Therapeutics Reports First Quarter 2023 Financial Results and Recent Operational Highlights." The press release stated, in relevant part:

> [BioXcel], a biopharmaceutical company utilizing artificial intelligence approaches to develop transformative medicines in neuroscience and immune-oncology, today announced its financial results for the first quarter ended March 31, 2023, and provided an update on key strategic initiatives.
>
> "The first quarter marked a strong start to the year with numerous advancements in our clinical programs and continued commercial focus building the agitation market for our new therapeutic option in a historically underdiagnosed and underserved medical condition," said [Mehta], CEO of [BioXcel]. "We are gearing up to announce top-line data readouts in agitation from two Phase 3 pivotal trials as well as BXCL501 potential as an adjunctive treatment for chronic use in our MDD program. In addition, IGALMI's launch momentum is expanding our reach into addressable market opportunities. We believe the second quarter of 2023 represents a defining moment for the Company as we expand the full potential of BXCL501 in agitation for at-home use and long-term care settings, and in depression. These upcoming catalysts may have a transformational impact for patients in need and all our stakeholders."
>
> *       *       *
>
> <u>Development Pipeline</u>
>
> BXCL501, an investigational proprietary sublingual film formulation of

dexmedetomidine, has received [b]reakthrough [t]herapy and [f]ast [t]rack designation for the acute treatment of agitation associated with dementia.

- Alzheimer's Disease-related Agitation: TRANQUILITY program is designed to evaluate BXCL501 for the acute treatment of Alzheimer's-related agitation; up to 100 million Alzheimer's-related agitation episodes are estimated to occur in the U.S. annually.

  - TRANQUILITY II: Trial is fully enrolled, and all patients have completed the study in assisted living facilities (ALFs) and residential care settings.

    - Data cleaning and verification in progress.

    - Top-line data from pivotal trial expected in June 2023.

- TRANQUILITY III: Continuing enrollment of patients with moderate to severe dementia in long-term-care facilities.

104. These positive statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (i) that the Company lacked processes to properly and effectively monito the TRANQUILITY II trial; (ii) the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; (iii) that the Company had in fact experienced such breaches when a BioXcel principal investigator failed to adhere to informed consent forms approved by the institutional review board, failed to maintain proper case histories for patients whose records were ultimately reviewed by the FDA, and fabricated email correspondence with a pharmacovigilance safety vendor that was subsequently reviewed by the FDA; and (iv) that these breaches would have a negative a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease.

**8.   May 8, 2023 Earnings Call**

105. During the May 8, 2023 earnings call for 1Q23, Defendant Mehta stated in

pertinent part: "On the clinical front, we are very excited for 3 key data readouts across our lead neuropsychiatric program, BXCL501. ***These data readouts are on track and expected to enable significant potential market expansion… our TRANQUILITY II program continue to advance, and we are on track to report top line data in June.***"

106.    During that same call, while discussing BioXcel's first quarter 2023 financial results, Defendant Steinhart stated in pertinent that "***We expect to see a notable uptick in revenue in the second half of the year as we believe we will continue to accrue more formulary approvals… The increased expenses were primarily attributable to multiple clinical trials and CMC costs related to our upcoming 3 data readouts… We believe that full execution of our strategic financing with Oaktree and Qatar Investment Authority and IGALMI revenues will result in a cash runway into 2025.***"

107.    These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) Defendants received the Form 483 Letter which explained that, in fact, there were numerous deficiencies and violations associated with the portion of the TRANQUILITY II trial at the North Miami site; (2) These deficiencies meant that any data which was ultimately released would be subject to scrutiny and lack of confidence in their accuracy; and (3) the Form 483 had also materially and negatively impacted BioXcel's "market expansion" efforts given the delay that the Form 483 would have on the Company's clinical trial.

### 9.    May 9, 2023 Bank of America Presentation

108.    On May 9, 2023, Defendant Risinger spoke at the Bank of America Global Healthcare Conference and stated, in pertinent part that "***That [TRAQUILITY II] trial is***

*completed. The last patient has completed. The data is being locked and undergoing verification"..."We have very high confidence in demonstrating not only efficacy, but also the safety in patients living in an assisted living or residential care setting."*

109.    These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) the TRANQUILITY II study was not complete, and the FDA had sent the Fonn 483 which indicated that the study enrolled patients who had not properly consented, included patients who should have been excluded, failed to maintain accurate patient histories, and failed to administer the drug in accordance with the study's FDA-approved protocol; and (2) the principal investigator Dr. Meyer fabricated an email to the FDA which had purported to show that the principal investigator complied with reporting requirements for SAEs.

**10. May 9, 2023 Form 10-Q**

110.    On May 9, 2023, BioXcel filed its Form 10-Q for the quarter ended March 31, 2023. Defendants Mehta and Steinhart signed the Form 10-Q on behalf of BioXcel. In the Form 10-Q, the Company disclosed that it "believes that its existing cash and cash equivalents will be sufficient to cover its cash flow requirements for at least the next 12 months from the issuance date of these condensed consolidated financial statements."

111.    These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) just three months later on August 14, 2023, the Company announced that there was substantial doubt about the Company's ability to continue as a going concern because it had "limited liquidity resources" on hand; (2) on December 21, 2022, the FDA issued a Form 483 Letter for violations in the TRANQUILITY II clinical trial, and this Form 483

Letter affected Defendants' ability to meet regulatory milestones required by the Company's financing agreements with Oaktree and QIA. Thus, Defendants had reason to believe that the Company would not be able to extend its cash runway into 2025, and, on August 14, 2023, the Company announced its cash runway had run short, and it had doubts about its ability to continue as a going concern.

**11. May 25, 2023 Investor Call**

112.     On May 25, 2023, the Company held a Special Call for investors to discuss topline results for BioXcel's SERENITY III clinical trial. During the call, Defendant Mehta provided, in pertinent part, that:

> Beyond SERENITY III, we are very excited about BXCL501 's recent and upcoming data readout, which we believe showcases its pipeline within a product potential. These include the positive top line data we announced for the major depressive disorder program last week, and our TRANQUILITY II trial examining 501 in Alzheimer's-related agitation expected in June. As a reminder, our Alzheimer's-related agitation program is evaluating 40- and 60-microgram doses ofBXCL501 in TRANQUILITY II and Ill.
>
> In elderly patient, the exposure levels of the 60-microgram dose are almost double and equivalent to the 120-microgram dose in adults. Additionally, the 60-microgram dose met all 5 efficacy endpoints in the TRANQUILITY I study. ***We are confident in the TRANQUILITY II design and plan.*** These catalysts support BXCL501 potential in multiple neuropsychiatric conditions of significant unmet medical need and reinforce the breadth and depth of our innovative neuroscience portfolio.

113.     These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) the Form 483 Letter; (2) Dr. Meyer had violated the "TRANQUILITY II design and plan" rendering that the data from the trial was potentially invalid and inaccurate; and (3) there was a material risk that the expanded commercialization of BXCL501 would be delayed or abandoned, all of which was contrary to Defendant Mehta's representation

that he was "confident" in the study's outcome.

**12. June 8, 2023 Jefferies Healthcare Conference**

114.     During a presentation at the Jefferies Healthcare Conference on June 8, 2023, Chris Howerton from Jefferies Group LLC asked Mehta: "Okay.  All right.  Well, let's say, Vimal, we're going to get those stupendous data at the end of this month.  Can you file an SNDA right after that?  Or, I guess, what would be the regulatory expectations after that?"  Defendant Mehta responded, "So that's a great question.  ***It depends on the data.***  How well is efficacy data as well as safety.  And if you think about the need for these patients, 100 million episodes, even if it's half of the market and half of them are in nursing home or who are more frequent agitation, which we are doing capturing In TRANQUILITY II.  We will have a conversation with the FDA, ask them what do we need to file the SNDA, and then fill those gaps and file it.  ***If they allow us to file it with TRANQUILITY  II, we'll be ready to go, basically, if we don't need to generate anything."***

115.     These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) that Defendants had received the FDA issued the Form 493 Letter on December 21, 2022, calling into question the integrity of the TRANQUILITY II Study; (2) there were ongoing problems with the TRANQUILITY II Study; (3) they would not "be ready to go;" (4) they would also certainly need to generate something before they may file the SNDA.

**13. June 14, 2023 Goldman Sachs Healthcare Conference**

116.     During the Goldman Sachs Healthcare conference on June 14, 2023, Defendant Risinger told investors that BioXcel had ***"a lot of confidence in being able to demonstrate both efficacy and safety"*** through the TRANQUILITY  II trials.

117.    Risinger's statement about the data from TRANQUILITY II was misleading because it omitted to disclose that, due to the violations laid out in the Form 483 issued by the FDA, the efficacy and safety data produced from the TRANQUILITY II were compromised.

118.    These statements were materially false and/or misleading and omitted material adverse facts about the Company's business, operations, and prospects. Specifically, the statements failed to disclose: (1) the FORM 483 letter undermined any "*confidence in being able to demonstrate both efficacy and safety;" and (2)* the TRANQUILITY  II trials would likely be delayed and/or rendered worthless.

### BIOXCEL GOES PUBLIC WITH THE FORM 483 LETTER

119.    On June 29, 2023, before the market opened, the Individual Defendants caused BioXcel to file a Current Report with the SEC on Form 8-K. The Report disclosed, in relevant part:

> In December 2022, the [FDA] conducted an inspection of one of the clinical trial sites in the Phase 3 TRANQUILITY II clinical trial, where the principal investigator enrolled approximately 40% of the subjects participating in the trial. At the conclusion of this inspection, the FDA issued an FDA Form 483 identifying three inspectional observations. These observations related to *the principal investigator's failure to adhere to the informed consent form approved by the [i]nstitutional [r]eview [b]oard for a limited number of subjects whose records the FDA reviewed, maintain adequate case histories for certain patients whose records the FDA reviewed, and adhere to the investigational plan in certain instances. For example, the FDA cited the principal investigator's delay in informing the sponsor's medical monitor or pharmacovigilance safety vendor of a [SAE] for one of the subjects, which report was made to the Company's vendor outside of the 24 hour time period prescribed by the clinical trial protocol.* The principal investigator for this clinical site responded to the FDA observations within the time period requested. The FDA inspection remains open, as the FDA has not issued an Establishment Inspection Report.
>
> In May 2023, it came to the Company's attention that *this same principal investigator in the TRANQUILITY II clinical trial may have fabricated email correspondence purporting to demonstrate that the investigator timely submitted to the Company's pharmacovigilance safety vendor a report of an SAE from a different subject than the one cited in the FDA Form 483, and*

*purporting to show that the vendor had confirmed receipt.* Upon receipt of this information, the Company promptly initiated an investigation and recently received confirmation

timing of the reporting of this SAE to the Company's pharmacovigilance vendor to make it appear as though this SAE had been timely reported to the pharmacovigilance vendor as required by the clinical trial protocol. The Company also confirmed that this SAE had been timely entered into the electronic data capture system, even though the SAE had not been separately reported to the Company's pharmacovigilance safety vendor within the 24 hour timeframe required under the protocol.

In connection with this ongoing investigation, the Company was made aware that *the fabricated email correspondence was provided to the FDA by the principal investigator's employer during the on-site inspection in December 2022.* After unblinding of the data, the Company determined that the SAE that was the subject of this fabricated correspondence between the principal investigator and the Company's pharmacovigilance vendor occurred in a subject in the placebo arm. This principal investigator has not participated in any other clinical trial sponsored or conducted by the Company. Moreover, the study was designed such that trained study staff other than principal investigators were to conduct assessments of the primary efficacy measure.

*The Company is currently in the process of conducting an investigation into protocol adherence and data integrity at the principal investigator's trial site* and is in the process of retaining an independent third party to audit the data collected at the site. The Company's ongoing investigation and/or the planned independent audit may uncover new findings regarding the integrity of the trial data from this principal investigator's site, the accuracy of safety or efficacy findings, or the usability of the data in connection with a marketing application. The Company plans to complete its investigation as soon as possible, although the Company can provide no assurance regarding the timing of the completion of its own investigation or the timing of the completion of the planned independent audit of the trial site. Further, *the Company has notified the FDA of these findings* and the steps it intends to take to validate the integrity of the data generated by this investigator for the TRANQUILITY II trial.

120.    The Report also included a "supplemental risk factor", which stated, in relevant

part:

*Developments relating to the Company's TRANQUILITY II Phase 3 trial may impact the timing of the Company's development plans for, and prospects for regulatory approval of, BXCL501 for the acute treatment of agitation associated with dementia in patients with probably Alzheimer's disease.*

The timing of the Company's marketing application and prospects for regulatory approval of BXCL501 for the acute treatment of agitation associated with dementia in patients with probable Alzheimer's disease may be adversely impacted by these developments. For example, even if the Company's investigation and the independent audit conclude that data from the TRANQUILITY II trial have not been affected or compromised by the principal investigator's actions or other deficiencies at the trial site, the FDA may not accept or agree with the Company's conclusions or analyses, or may interpret or weight their importance differently. Further, if the Company or the FDA determines that there are issues with data integrity and/or compliance with good clinical practice requirements at the trial site, the Company may be unable to use some or all of the subject data generated at this clinical site to support a marketing application. If all or a substantial portion of such data were discarded, the TRANQUILITY II trial may no longer be adequately powered for statistical significance and the Company may need to conduct a new clinical trial. If the Company conducts a new Phase 3 trial, such trial may have different safety or efficacy results from the topline data the Company is announcing today. Topline data from the TRANQUILITY II trial, including results from subjects at this principal investigator's site, may not be predictive of the results in any new trial. Further, any investigation, disqualification or debarment of, or proceeding or action against the principal investigator, or any investigation, proceeding or action against the Company, could further delay development and approval of BXCL501 for this indication, and otherwise have a material adverse effect on the Company, its financial condition, results of operations and prospects.

121.     On this news, BioXcel's stock price dropped $11.28 per share on June 29, 2023, to close at $6.39 per share, losing more than half of its market capitalization in a single day.

## **BIOXCEL ADMITS TO FALSE STATEMENTS**

122.     Defendant Risinger admitted *that the Company knew of the FDA investigation since December 2022.* On June 29, 2023, the analyst from Mizuho (who identified himself as "Richard on for Graig Suvannavejh") asked Defendant Risinger, "Li]ust a few questions for me is that in the 8-K, you mentioned finding this out in December and then again in May, how come the company didn't disclose this sooner? What's the strategy here?" Defendant Risinger responded, *"The FDA did the audit back in December. We were aware of it, and we've been monitoring that site even more closely."* Notably, Defendant Risinger ignored the part of the question about *why* there was a delay, and simply confirmed that the Company did indeed know

about the FDA investigation since December 2022.

123.    It is also axiomatic that BioXcel would have known about the Form 483 letter because as the TRANQUILITY II sponsor.

124.    A sponsor is required to conduct audits of its clinical trial sites and investigators to ensure that the clinical investigator and all research team members assisting in the conduct of a clinical trial are informed about their obligations and responsibilities as they pertain to GCP, the investigational plan, applicable regulations, FDA guidance, and institutional policies.  By law, BioXcel either knew prior to or upon receipt of the Form 483 that: (1) the short-informed consent form in Spanish that had been provided to research subjects, was not approved by the IRB, and did not include risks to subjects and study procedures (which would have been flagged by the IRB as missing); (2) the subjects who were enrolled in the study and received investigational product potentially met exclusion criteria; (3) certain aspects of the study were not being conducted according to the approved protocol; and (4) the SAE that was not reported within the timeframe required by the protocol.

125.    Even without conducting its own audit, BioXcel knew about these compliance violations after the FDA conducted an inspection of the North Miami Site and subsequently issued the Form 483 letter.  Dr. Meyer was required to notify BioXcel of the inspector's arrival and inspection.

126.    Upon this notification, BioXcel was required to have staff on site, at least, during the close out meeting, where the FDA investigator discusses the content of the Form 483 letter.

## INSIDER TRADING

127.    Federal securities law prohibits corporate insiders from trading company securities while aware of material nonpublic information.

128.     The Company's Insider Trading Policy effective during the Relevant Period also includes trading restrictions and prohibits corporate insiders from trading company securities while aware of material nonpublic.

129.     Defendant Mehta made the following stock sales during the Relevant Period:

**MEHTA**

| Filing Date | Trade Date | Ticker | Insider Name | Title | Trade Type | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 2023-06-16 18:40:04 | 2023-06-15 | **BTAI** | Mehta Vimal | CEO, Pres | S - Sale+OE | $20.86 | -60,000 | 41,903 | -59% | -$1,251,727 |
| 2023-05-24 16:37:44 | 2023-05-22 | **BTAI** | Mehta Vimal | CEO, Pres | S - Sale | $25.79 | -6,500 | 39,294 | -14% | -$167,641 |
| 2023-03-22 19:30:34 | 2023-03-20 | **BTAI** | Mehta Vimal | CEO, Pres | S - Sale+OE | $18.97 | -64,500 | 8,564,644 | -1% | -$1,223,313 |
| 2022-12-19 20:00:31 | 2022-12-15 | **BTAI** | Mehta Vimal | CEO, Pres, 10% | S - Sale+OE | $19.69 | -60,000 | 8,558,707 | -1% | -$1,181,498 |
| | | | | | | | | | Total = | **$3,824,179** |

130.     Defendant Mehta sold 191,000 shares of BioXcel stock during the Relevant Period, yielding him a net profit of $3,750,379.00.

131.     Through these transactions, Mehta disposed of approximately 91.8% of the total shares, including stock units, he had available during the Relevant Period. Other than these, Defendant Mehta had not made any other direct sales of shares of BioXcel stock.

132.     Some or all of these sales violated BioXcel's Insider Trading Policy, of which Mehta was responsible to enforce as the Insider Trading Compliance Officer, for "**Qualitative Limits for Sales By Directors and Officers**" because Mehta sold "more than 1/12th of 25% of the vested interest in the Company's common stock held by the person that is adopting the Trading Plan as of the effective date of such Trading Plan."

**NANDABALAN**

133.     Defendant Nandablan made the following stock sales during the Relevant Period:

| Filing Date | Trade Date | Ticker | Insider Name | Title | Trade Type | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 2023-04-10 18:20:14 | 2023-04-06 | **BTAI** | Nandabalan Krishnan | Dir, 10% | S - Sale+OE | $17.32 | -60,000 | 8,546,750 | -1% | -$1,039,200 |
| 2023-01-06 20:00:30 | 2023-01-04 | **BTAI** | Nandabalan Krishnan | Dir, 10% | S - Sale+OE | $22.01 | -60,000 | 8,546,750 | -1% | -$1,320,876 |
| 2022-11-14 20:00:35 | 2022-11-10 | **BTAI** | Nandabalan Krishnan | Dir, 10% | S - Sale+OE | $15.00 | -60,000 | 8,546,750 | -1% | -$900,000 Total = **$3,260,076** |

134.    Director Nandabalan sold 180,000 shares of BioXcel stock during the Relevant Period, yielding him a net profit of $3,186.271.89.

135.    Through these transactions, Nandablan disposed of all the shares he directly owned during the Relevant Period. Other than these, Director Nandabalan had not made any other sales of shares of BioXcel stock.

136.    Some or all of these sales violated BioXcel's Insider Trading Policy, of which Mehta was responsible to enforce as the Insider Trading Compliance Officer, for "**Qualitative Limits for Sales By Directors and Officers**" because Nandablan sold "more than 1/12th of 25% of the vested interest in the Company's common stock held by the person that is adopting the Trading Plan as of the effective date of such Trading Plan."

**STEINHART**

137.    Defendant Steinhart made the following stock sales during the Relevant Period:

| Filing Date | Trade Date | Ticker | Insider Name | Title | Trade Type | Price | Qty | Owned | ΔOwn | Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 2023-05-16 20:32:19 | 2023-05-15 | **BTAI** | Steinhart Richard I | CFO | S - Sale+OE | $27.17 | -5,000 | 1,500 | -77% | -$135,864 |
| 2023-03-16 18:02:03 | 2023-03-15 | **BTAI** | Steinhart Richard I | CFO | S - Sale+OE | $19.50 | -2,084 | 1,500 | -58% | -$40,638 |

138.    Through these transactions, Steinhart disposed of approximately 93.1% of the total

shares, including stock units, he had available during the Relevan Period. Other than these, Defendant Steinhart had not made any other sales of shares of BioXcel stock.

139.   The Insider Trading Defendants were aware of material nonpublic information about BioXcel when they sold this BioXcel stock.

140.   While the foregoing sales of BioXcel stock were purportedly made pursuant to 10b5-1 trading plans that were entered into shortly before the Relevant Period, Defendant Mehta and Director Nandabalan's trading plans were entered into on August 31, 2022, at a time when they were well-aware of adverse material nonpublic information. Defendant Steinhart entered into a 10b5-l trading plan on June 23, 2022.

141.   The Form 4s filed with the SEC reflecting the 10b5-l trading plans do not indicate the terms and conditions of the plans and the minimal and sporadic sales do not reflect a pattern or timing consistent with typical 10b5-l trading plans.

## EXCESSIVE COMPENSATION

142.   On April 5, 2022, BioXcel issued its proxy statement for the 2022 Annual Meeting of Shareholders, to be held on May 19, 2022 (the "2022 Proxy").

143.   As set forth in the 2022 Proxy:[1]

**Director Compensation Table**
The following table sets forth information for the year ended December 31, 2021 regarding the compensation awarded to, earned by or paid to our non-employee directors:

| Name | Fees Earned or Paid in Cash ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Peter Mueller, Ph.D. | 114,806 | 412,458(2) | — | 527,264 |
| Sandeep Laumas, M.D. | 88,653 | 412,458(3) | — | 501,111 |
| Krishnan Nandabalan, Ph.D.(5) | — | — | 150,000 | 150,000 |

---

[1] BioXcel 2022 Proxy Statement at 27.

| | | | |
|---|---|---|---|
| Michal Votruba, M.D., Ph.D. | 67,500 | 412,458(4) | — | 479,958 |
| June Bray | 37,194 | 906,284(6) | — | 943,478 |

144.    According to this table, the average compensation for BioXcel's non-employee director in 2021 was $520,362.20.[2]

145.    On May 17, 2023, BioXcel issued its proxy statement for the 2023 Annual Meeting of Shareholders, to be held on June 26, 2023 (the "2023 Proxy").

146.    As set forth in the 2023 Proxy:[3]

**Director Compensation Table**

The following table sets forth information for the year ended December 31, 2022 regarding the compensation awarded to, earned by or paid to our non-employee directors:

| Name | Fees Earned or Paid in Cash ($) | Option Awards ($)(1) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Peter Mueller, Ph.D. | 120,840 | 174,327(2) | — | 295,167 |
| Sandeep Laumas, M.D. | 90,289 | 174,327(3) | — | 264,616 |
| Krishnan Nandabalan, Ph.D.(7) | | — | $  100,000 | $100,000 |
| Michal Votruba, M.D. | 68,421 | 174,327(4) | — | 242,748 |
| June Bray | 64,368 | 174,327(5) | — | 238,695 |
| Michael Miller | 19,194 | 336,057(6) | — | 355,251 |

---

[2] Director Nandabalan should not be included in the average compensation for a non-employee director because the 2021 Proxy states his "Current Positions with BTAI" as a "Director and Chief Digital Officer." Thus, he is not a non-employee director. The 2021 proxy further states "Dr. Nandabalan serves as President and Chief Scientific Officer of BioXcel Corporation and does not receive compensation for his service on our board. During 2021, Dr. Nandabalan served as a consultant to the Company in the capacity of Chief Digital Officer and amounts shown in the table above represent cash fees earned by Dr. Nandabalan for his service to the Company in such role. See "Certain Transactions with Related Persons - Consulting Arrangements with BioXcel LLC Employees" below for additional information. As of December 31, 2021, Dr. Nandabalan held options to purchase 489,000 shares of our common stock, of which 481,188 shares of common stock were exercisable."

[3] BioXcel 2023 Proxy Statement at 26.

147.    According to this table, the average compensation for BioXcel's non-employee director in 2022 was $249,412.83.

**Summary Compensation Table**
The following table shows information regarding the compensation of our NEOs for the years presented.

| Name and Principal Position | Year | Salary ($) | Bonus ($)(1) | Stock Awards ($)(2) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation ($)(3) | All Other Compensation ($)(4) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Vimal Mehta, Ph.D. | 2022 | 944,436 | 150,000 | 800,592 | 1,994,080 | 654,662 | 15,425 | 4,559,195 |
| *Chief Executive Officer* | 2021 | 916,701 | — | — | 7,964,625 | 483,052 | 7,800 | 9,372,177 |
| Javier Rodriguez | 2022 | 403,650 | 50,000 | 181,439 | 398,219 | 177,606 | 7,625 | 1,218,539 |
| *Senior VP and Chief Legal Officer* | 2021 | 334,028 | — | — | 1,543,898 | 136,500 | — | 2,014,426 |
| Matthew Wiley | 2022 | 402,500 | — | — | 1,307,572 | 210,000 | 7,625 | 1,927,697 |
| *SVP and Chief Commercial Officer* | | | | | | | | |

148.    These non-employee director Defendants were paid on average $520,362.20 in 2021.

149.    However, excluding Nandabala, who has served as a consultant in the capacity of Chief Digital Officer from January 2020 until August 2022 (who received $150,000 for the year attributable to unrelated consulting services) and who the Company disclosed as having a current position with BTAI in 2021, the total annual compensation per non-employee director in 2021 was $612,952.75.  This amount was grossly excessive.

150.    By comparison, the average director compensation in 2021 for non-employee directors on boards of "large-cap" companies included in the S&P 500 $312,279.[4]

151.    As shown in the below table containing the average annual non-employee director compensation for the cross section of Top 200 health, biotech, and pharmaceutical companies

---

[4] Available at https://www.spencerstuart.com/ /media/2021/october/ssbi2021/usspencer- stuart-board-index-2021.pdf.

identified by Steven Hall & Partners in its 2021 Director Compensation Study ("Hall Study"), the

average compensation paid to the Company's non-employee directors has been greater than the

average of even the largest comparable healthcare companies the world in 2020 and 2021.[5]

| Company | Market Cap as of September 30, 2022 (Billions) | 2021 Average Total Director Compensation Per Director | 2020 Average Total Director Compensation Per Director |
|---|---|---|---|
| Abbott Laboratories | $169.45 | $270,420.14 | $285,234.23 |
| Cardinal Health, Inc. | $18.17 | $282,733.55 | $322,025.62 |
| HCA Healthcare, Inc. | $118.44 | $330,442.56 | $178,174.80 |
| Pfizer Inc. | $245.60 | $361,386.55 | $354,245.85 |
| AbbVie, Inc. | $237.30 | $351,334.45 | $343,940.82 |
| Centene Corp. | $44.47 | $393,811.00 | $437,923.91 |
| Humana, Inc. | $61.40 | $338,886.17 | $343,785.58 |
| Stryker Corp. | $206.46 | $272,760.60 | $247,323.36 |
| AmerisourceBergen Corp. | $28.05 | $316,100.50 | $293,335.50 |
| Cigna Corp. | $84.66 | $335,514.00 | $336,096.75 |
| Johnson & Johnson | $429.50 | $328,825.00 | $329,045.83 |
| Tenet Healthcare Corp. | $5.56 | $355,761.56 | $313,288.78 |
| Amgen, Inc. | $120.57 | $335,927.25 | $329,356.75 |
| CVS Health Corp. | $125.20 | $342,500.00 | $342,500.00 |
| McKesson Corp. | $48.85 | $230,293.43 | $303,322.27 |
| Teva Pharmaceutical Industries Ltd. | $10.04 | $323,511.33 | $305,104.50 |
| Anthem, Inc. | $114.60 | $408,857.30 | $366,626.11 |
| Danaher Corp. | $187.89 | $324,449.40 | $296,981.30 |
| Medtronic Plc | $82.60 | $344,971.82 | $357,688.00 |
| Thermo Fisher Scientific, Inc. | $198.71 | $319,904.33 | $296,128.31 |
| Becton, Dickinson & Co. | $63.55 | $340,399.27 | $335,703.82 |
| Eli Lilly & Co. Merck & Co., Inc. | $307.24 | $293,829.93 | $317,120.08 |
| UnitedHealth Group, Inc. | $472.41 | $343,081.50 | $373,269.90 |
| Bristol Myers Squibb Co. | $151.80 | $311,109.79 | $317,578.73 |
| Gilead Sciences, Inc. | $77.32 | $364,584.50 | $393,667.00 |

[5] Available at https://8fccb7e2-126b-49c6-baca-2fdfa85e2lc5.usrfiles.com/ugd/ 8fccb7
e5f870dd0d714847ab28b5a912faf946.pdf.

| Molina Healthcare, Inc. | $19.16 | $339,299.44 | $381,589.63 |
| | | | |
| **AVERAGE:** | **$139.58** | **$329,257.51** | **$326,963.75** |
| | | | |

152. BioXcel, notably, is not a Top 200 Company, a member of the S&P 500, nor even a large-cap company. With a current market capitalization of approximately $86.79 million, BioXcel is barely considered a "small cap."

153. Below is a table containing the average annual non-employee director compensation for the cross section of small cap health, biotech, and pharmaceutical companies identified in the Hall Study. This chart provides a stark illustration of how excessive the Board's non-employee director compensation is compared to other companies. Despite being smaller than most, if not all, of the companies chosen by the Hall Study, BioXcel's average director compensation greatly exceeds the average of other small caps, health, biotech, and pharmaceutical companies.

| Company | Market Cap as of September 30, 2022 (Millions) | 2021 Average Total Director Compensation Per Director | 2020 Average Total Director Compensation Per Director |
|---|---|---|---|
| AMN Healthcare Services, Inc. | $4,585.00 | $207,729.00 | $191,089.22 |
| AngioDynamics, Inc. | $797.33 | $231,369.29 | $204,330.63 |
| Coherus BioSciences, Inc. | $746.93 | $319,535.22 | $308,401.13 |
| CONMED Corp. | $2,442.00 | $235,154.00 | $235,297.22 |
| Corcept Therapeutics, Inc. | $2,746.00 | $426,796.00 | $552,084.14 |
| CorVel Corp. | $2,409.00 | $156,346.67 | $105,498.83 |
| Cross Country Healthcare, Inc. | $1,085.00 | $175,000.00 | $175,000.00 |
| CryoLife, Inc. (k/n/a Artivion) | $557.97 | $184,969.11 | $193,851.63 |
| Cutera, Inc. | $892.64 | $237,643.50 | $138,059.00 |
| Cytokinetics, Inc. | $4,561.00 | $384,116.20 | $404,663.33 |
| Integer Holdings Corp. | $2,061.00 | $274,125.55 | $306,953.33 |
| Lannett Co., Inc. | $19.33 | $298,998.00 | $271,357.86 |
| Meridian Bioscience, Inc. | $1,379.00 | $158,129.13 | $149,312.50 |
| Merit Medical Systems, Inc. | $3,208.00 | $268,831.33 | $220,187.50 |

| | | | |
|---|---|---|---|
| NeoGenomics, Inc. | $1,083.00 | $197,375.30 | $166,184.33 |
| NextGen Healthcare, Inc. | $1,204.00 | $246,154.82 | $307,503.88 |
| Omnicell, Inc | $3,854.00 | $275,328.67 | $282,074.63 |
| Phibro Animal Health Corp | $538.29 | $50,000.00 | $50,000.00 |
| Spectrum Pharmaceuticals, Inc. | $80.91 | $341,159.83 | $253,998.75 |
| Ensign Group, Inc. | $4,396.00 | $417,334.00 | $230,166.33 |
| Vanda Pharmaceuticals, Inc. | $558.83 | $249,240.00 | $178,894.50 |
| Varex Imaging Corp. | $843.49 | $267,151.17 | $221,576.29 |
| | | | |
| **AVERAGE:** | **$1,820.40** | **$254,658.49** | **$233,931.14** |

154.   Not only is the 2021 BioXcel non-employee director compensation almost triple the average 2021 compensation of the small cap healthcare companies identified by the Hall Study ($233,931.14, average market cap of $1.82 billion), it is excessive even when compared to the largest healthcare companies in the world.

## **DEMAND FUTILITY**

155.   Plaintiff brings this action derivatively in her own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by BioXcel as a direct result of the violations of the federal securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.

156.   BioXcel is named as a Nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

157.   Plaintiff will adequately and fairly represent the interests of BioXcel and its shareholders in enforcing and prosecuting its rights.

158.   The Board currently consists of the following six (6) directors: Mehta, Mueller, Bray, Laumas, Miller, and Votruba. Nandabalan resigned from the Board on September 19, 2023 but was a member of the Board at all times relevant to the illegal and wrongful conduct described

herein.

159.    Plaintiff need only to allege demand futility as to three of the twelve Directors that were on the Board (the "Demand Board") when this complaint was filed, and no board member joined after the Relevant Period started.

160.    Every currently sitting board member is also a named defendant herein because they served as a board member during the misconduct alleged throughout the Relevant Period.

161.    Every defendant signed at least one 10-K or proxy that was false and misleading for the reasons set forth herein.

162.    Thus each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This scheme renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

163.    As forth above, each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

164.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Defendant Mehta**

165.    Mehta is the Company's CEO and a board member and has served in these dual positions since 2017.  BioXcel is a NASDQAQ listed company, and NSADAQ listed company rules specifically state that Mehta cannot be considered independent.  BioXcel also expressly concedes Mehta as not independent as stated in its 2023 Proxy filed with the SEC on Form DEF 14A, in which the Individual Defendants admitted that Mehta is not independent.

**Laumas, Mueller, Miller, And Votruba As Members Of The Audit Committee**

166.    Defendants Laumas, Mueller, Miller, And Votruba served on the audit committee during the relevant period.

167.    As Audit Committee members, they were specifically entrusted with assisting the Board in overseeing the Company's public disclosures, compliance with the Audit Committee charter, and liable for any violations thereof.

168.    The Company's press releases, conference calls, and public filings or lack thereof during the Relevant Period concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information.

169.    In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports and financial disclosures did not contain such materially misleading information. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Mueller, Bray and Laumas AS Nominating and Corporate Governance Committee Members**

170.    Mueller is presently Chair of the Nominating and Corporate Governance

Committee and Bray and Laumas are members of the Nominating and Corporate Governance Committee. According to the Nominating and Corporate Governance Committee charter, the Nominating and Corporate Governance Committee is responsible for, *inter alia* developing and recommending to the Board corporate governance guidelines. As Chair and/or members of the Nominating and Corporate Governance Committee, Mueller, Bray, and Laumas failed to ensure adherence to the Company's corporate governance guidelines as the Nominating and Corporate Governance Committee Charter required them to do. This failure of oversight led to a breakdown in the Company's internal controls and allowed BioXcel to file false and/or misleading financial statements with the SEC and make false and/or misleading statements to the public. Therefore, Mueller, Bray, and Laumas breached their fiduciary duties, are not disinterested, and thus demand is excused as to them.

**Signatories to Misleading SEC Filings**

171.    Every Director Defendant served on the board during the misconduct alleged herein and every Director Defendant signed a 10-K.

172.    Also, as members of the Board, the Director Defendants were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.

173.    Mehta, Mueller, Bray, Laumas, Miller, and Votruba violated section 14(a) of the Exchange Act by negligently making material misstatements and omissions in the Proxy Statements. It is against public policy to indemnify individuals for violations of section 14(a) of

the Exchange Act. Accordingly, any indemnification provided by the Company to Mehta, Mueller, Bray, Laumas, Miller, and Votruba does not protect them from their violations. As a result, Mehta, Mueller, Bray, Laumas, Miller, and Votruba face a substantial likelihood ofliability, excusing a demand.

174.    As the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties and no Director Defendant has taken remedial action to redress the conduct alleged herein and therefore demand upon them is futile.

**Insider Trading**

175.    While in possession of MNPI, Mehta, Steinhart and Nandabalan sold substantial amounts of their personally held BioXcel stock. In doing so, they have exposed themselves to criminal liability and heightened civil liability and damages. These insider sales, occurring during the Relevant period, create a further likelihood of additional significant liability, thus making Mehta, Steinhart and Nandabalan neither disinterested nor independent.

176.    The other director defendants are also exposed to this insider selling by Mehta, Steinhart and Nandabalan because they recklessly and in breach of their fiduciary duties appointed Mehta as the Insider Trading Compliance Officer, and as CEO, who owns substantial stock in the Company and sold that stock during the Relevant Period, Mehta is conflicted, self-interested, and incapable of enforcing the Insider Trading Compliance Officer rules as to himself or any other officer who modeled their stock sales after Mehta.

**Insider Trading Policy Violations and Enforcement**

177.    Under the Insider Trading Policy, insiders who engage in transactions in the Company's securities at a time when they have knowledge of nonpublic information regarding the Company may be subject to the following penalties: (1) civil penalty of up to three times the profit

gained or loss avoided; (2) a criminal fine of up to $5,000,000; and (3) a jail term of up to twenty years.

178.    Thus, the Company may be eligible for treble damages from Mehta, Steinhart and Nandabalan but the board has taken no action against them, refusing to enforce its own Insider Trading Policy when it comes to their fellow board members.

179.    Since the board could have taken action to recover treble damages for these Insider Trading Policy violations but has not done so, they have pre-judged this action and demand is futile.

**Excessive Compensation**

180.    During the Relevant Period, BioXcel paid Bray $1,182,173 in total compensation, paid Laumas $765,727 in total compensation, paid Votruba $722,706 in total compensation, paid Mueller $822,431 in total compensation, and paid Miller $355,251 in total compensation.

181.    These amounts are highly excessive compared to other companies with similar revenue, sales, profit, market cap, history, and stock price.  The 2022 and 2023 Proxy does not even attempt to properly justify or explain this excessive compensation for these non-employee directors of a company whose revenue was zero in 2021 and $375,000 in 2022.

182.    These Individual Defendants have benefited from their own fiduciary breaches and are accordingly too self-interested to consider a demand.

183.    The Individual Defendants either knowingly or recklessly caused the Company to award its non-employee directors egregious cash and equity compensation, and knew of egregiousness at the time. A majority, if not all, the Individual Defendants receive the challenged compensation, stand on both sides of the compensation awards, and have a direct interest in the transactions at issue. The challenged compensation constitutes a substantial personal benefit to

the Individual Defendants. The Individual Defendants therefore breached their fiduciary duties, are not disinterested, and demand is excused as to them. As a result, the Individual Defendants breached their fiduciary duties of disclosure, good faith, and loyalty, face a substantial likelihood of liability, and are not disinterested, and demand upon them is futile and thus excused.

## FIRST CLAIM

**Against Mehta, Steinhart and Nadabalan for Breach of Fiduciary Duty Under *Brophy***

184.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.   BioXcel has an Insider Trading policy that, among other things:

No Insider shall engage in any transaction involving a purchase or sale of the Company's securities (including any offer to purchase or offer to sell), other than pursuant to a pre-approved trading plan that complies with Rule 10b5-1 promulgated under the Securities Exchange Act of 1934 (the "Exchange Act"), during any period commencing with the date that he or she possesses Material Nonpublic Information concerning the Company, and ending at the close of trading on the second Trading Day following the date of public disclosure of that information, or at such time as such nonpublic information is no longer material.

186.   The Insider Trading Policy expressly provides for a "civil penalty of up to three times the profit gained or loss avoided."

187.   As BioXcel's co-founder, CEO, President and a board member, Mehta owed fiduciary duties of loyalty and good faith to the Company and is bound by its Insider Trading Policy.

188.   As BioXcel's Senior Vice President and Chief Financial Officer, Steinhart owed fiduciary duties of loyalty and good faith to the Company and is bound by its Insider Trading Policy.

189.   As BioXcel's co-founder and a member of BioXcel's Board from May 2017 until September 19, 2023, when he resigned from the Board, Nadabalan owed fiduciary duties of loyalty

and good faith to the Company and is bound by its Insider Trading Policy.

190.    Mehta sold 191,000 shares of his personally held Company stock for proceeds of $3,824,179 during the Relevant Period.

191.    Steinhart sold 7,084 shares of his personally held Company stock for proceeds of $176,502 during the Relevant Period.

192.    Nandabalan sold 180,000 shares of his personally held Company stock for proceeds of $3,260,076 during the Relevant Period, while in possession of MNPI.

193.    Mehta, Steinhart and Nandabalan made these stock sales while in possession of inside information that the TRANQUILITY trial was being investigated by the FDA, a Form 483 letter was sent, the Form 483 letter would render the trials worthless, the Form 483 letter would substantially delay the launch of the Alzheimer drug, the Form 483 letter would force the Company to renege on its obligations to meet certain milestones to receive loan payments from its private lenders, the Form 483 letter would require funding the Company did not have, the Form 483 letter would expose the Company to fines, penalties, and lawsuits, and the Company had routinely made false and misleading statements in its financial filings and public statements.

194.    Mehta, Steinhart and Nandabalan knew this was information the market would consider material and that it was virtually certain to harm the Company's stock price and made these sales before disclosing this material information to the public.

195.    By selling their stock while in possession of adverse, material non-public information, Mehta, Steinhart and Nandabalan exploited their position, breached their fiduciary duties, an violated the Insider Trading Policy. Because Mehta, Steinhart and Nandabalan sold their stock before the non-public information in his possession could be publicly disclosed and harm the Company's stock price, Mehta, Steinhart, and Nandabalan improperly benefited from this

breach of fiduciary duty and the Company is entitled to treble damages and the imposition of a constructive trust on any profits Mehta, Steinhart, and Nadabalan obtained thereby.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of BioXcel's business and affairs.

198.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

199.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of BioXcel.

200.    In breach of their fiduciary duties owed to BioXcel, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; (iii) that the Company had in fact experienced such breaches when a BioXcel principal investigator failed to adhere to informed consent forms approved by the institutional review board, failed to maintain proper case histories for patients whose records were ultimately reviewed by the FDA, and fabricated email correspondence with a pharmacovigilance

safety vendor that was subsequently reviewed by the FDA; (iv) that these breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease; and (v) as a result, the statements made by, or caused to be made by, the Individual Defendants were materially false and/or misleading at all relevant times.

201.    As a result, the Defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

202.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

203.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

204.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of BioXcel's securities.

205.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was

engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of BioXcel's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

206.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, BioXcel has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

208.    Plaintiff, on behalf of BioXcel, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of The Securities Exchange Act of 1934**

209.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

210.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to

section 12 of this title [15 U.S.C. § 781]."

211.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

212.    BioXcel's 2022 and 2023 Proxy Statements violated Section 14(a) and Rule 14a-9 by misrepresenting or failing to disclose: (i) that the Company lacked adequate internal controls over protocol adherence and data integrity; (ii) as a result, the Company was highly susceptible to breaches of regulatory processes and procedures imposed by, *inter alia,* the FDA; (iii) that the Company had in fact experienced such breaches when a BioXcel principal investigator failed to adhere to informed consent forms approved by the institutional review board, failed to maintain proper case histories for patients whose records were ultimately reviewed by the FDA, and fabricated email correspondence with a pharmacovigilance safety vendor that was subsequently reviewed by the FDA; (iv) that these breaches would have a negative impact on BioXcel's ability to obtain regulatory approval of BXCL501 for the treatment of agitation associated with dementia in patients with probable Alzheimer's disease; and (v) as a result, the statements made by, or caused to be made by, the Individual Defendants were materially false and/or misleading at all relevant times.

213.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose these material facts, the statements contained in these Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the

Proxy Statements, including but not limited to, election of directors, approval of officer compensation, and appointment of independent auditors.

214.    Plaintiff's allegations with respect to the misleading statements in the 2022 and 2023 Proxy Statements (the "Proxy Statements") are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

215.    BioXcel was damaged as a result of the Individual Defendants' material misrepresentations and omissions in its Proxy Statements.

216.    Plaintiff, on behalf of BioXcel, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Unjust Enrichment

217.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of BioXcel by virtue of the excessive and unwarranted compensation paid to them while in breach of their fiduciary duties.

219.    Plaintiff, as a stockholder and representative of BioXcel, seeks restitution from the Individual Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

220.    Plaintiff, on behalf of BioXcel, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

221.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to BioXcel.

223.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation to certain of its directors and officers; (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending BioXcel and certain of its officers against the Securities Class Action; and (iii) subjecting the Company to additional costs associated with internal and external investigations into the wrongdoing.

224.     As a result of the waste of corporate assets, the Individual Defendants are liable to BioXcel.

225.     Plaintiff, on behalf of BioXcel, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief and judgment, as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of BioXcel and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.     Directing BioXcel to take all necessary actions to reform and improve its

corporate governance and internal procedures to protect BioXcel and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

1.  strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

2.  strengthening the Company's internal reporting and financial disclosure controls;

3.  developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

4.  strengthening the Company's internal operational control functions;

D.  Awarding punitive damages;

E.  Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

F.  Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: January 2, 2024                              **MOORE LAW, PLLC**

                                                    By:   s/ *Fletcher Moore*
                                                    FLETCHER MOORE

                                                    30 Wall Street, 8th Floor
                                                    New York, New York 10005
                                                    Telephone: (212) 709-8245
                                                    Email: fletcher@fmoorelaw.com

                                                    **SQUITIERI & FEARON, LLP**
                                                    Lee Squitieri
                                                    305 Broadway, 7th Floor
                                                    New York, New York 10007

Telephone: (212) 421-6492
Email: lee@sfclasslaw.com

*Counsel for Plaintiff*